IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MARY ANN PEREA,

      Plaintiff,

v.                                        No. 11-cv-930 JB/GBW

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

This matter is before me on Plaintiff Mary Ann Perea's Motion to Remand or Reverse the Social Security Administration (SSA) Commissioner's decision to deny Plaintiff disability insurance benefits and supplemental security income. *Docs. 19, 20*. I find that the ALJ erred by failing to consider Ms. Perea's mental impairments in his RFC determination and recommend that the Court grant Plaintiff's motion and remand this action to the Commissioner.

I.    **BACKGROUND**

    A.  **Plaintiff's medical history**

Mary Ann Perea is a fifty-seven year old woman with a history of knee and back pain, hypertension, hypothyroidism, carpal tunnel syndrome, and depression. Administrative Record (AR) at 13-14. Her hypertension and hypothyroidism appear to

be under control.  AR at 316.  However, since 2007, she has seen various physicians and specialists for carpal tunnel syndrome, knee and back pain, and depression.

As early as 2003, Dr. David Elliott noted that Ms. Perea had potential symptoms of carpal tunnel syndrome; this appears to be when she began wearing wrist braces as well.  AR at 334, 365.  On November 10, 2006, Ms. Perea saw Dr. Wendy Dimmette for nerve testing on her wrists and arms.  AR at 313-14.  In Dr. Dimmette's summary of the results, she noted that Ms. Perea had bilateral carpal tunnel syndrome that was worse on the left side than the right. AR at 314.  She recommended a surgical consultation for the left side and stated that physical therapy, injections, or surgery were options for the right side.  AR at 314.  In 2007, Ms. Perea told the orthopedic surgeon that the pain was constant and disturbed her sleep.  AR at 365.

In November 2007, Ms. Perea fell, injuring her right knee.  AR at 411. Arthroscopic surgery was performed on December 21, 2007 and Ms. Perea was pleased with the results.  AR at 361, 359.  However, Ms. Perea suffered a second injury to the same knee in February 2008, necessitating a second arthroscopic surgery on March 19, 2008.  AR at 411.  At a follow-up exam on April 3, 2008, Ms. Perea reported that she was 80 percent better and had no knee pain, though she reported chronic back pain at the same appointment.  AR at 398.  At an appointment on July 3, 2008, Ms. Perea indicated that she was having moderate knee pain and wished to begin injections to help with the pain.  AR at 471.  Ms. Perea received five injections over the next several weeks;

although she tolerated the injections well, she continued to report her knee pain as mild to moderate.  AR at 472-74, 494-95.

After Ms. Perea's February 2008 fall, she also suffered from back pain.  A radiology report from February 28, 2008, indicates mild scoliosis, some facet joint degenerative changes at L5-S1, a mild bulging disk at L4-5, and early disk desiccation at L2-3 and L3-4.  AR at 307-08.  Another radiology report from April 29, 2008, revealed mild degenerative disk disease at C5-C6 level with "a very tiny midline protrusion which is of indeterminate clinical significance."  AR at 405.  Ms. Perea received a steroid injection in her back on May 30, 2008, but at her follow-up appointment on June 20, 2008, she reported that the injection did not alleviate the pain at all.  AR at 453-54.  On July 8, 2008, Ms. Perea received diagnostic medial branch blocks to evaluate the origin of her back pain.  AR at 451-52.

Ms. Perea's treating physician, Dr. Elliott, noted on November 12, 2007 that Ms. Perea had been depressed for three to four days, but did not want any medication at that time.  AR at 311.  After an appointment on July 9, 2008, Dr. Elliott noted that Ms. Perea had become very depressed about her situation, in particular because of the conflict it has caused with her husband and its effect on her self-esteem.  AR at 460.  He also noted that Ms. Perea was often "awake at night, unable to sleep . . . very anxious and nervous and at times very panicky."  AR at 460.  Beginning in July 2008, and continuing until October 13, 2008, Ms. Perea was counseled by Virginia Alaniz, LPCC.

AR at 496-505.  Ms. Alaniz noted that Ms. Perea had a depressive disorder and assigned

her a Global Assessment of Functioning ("GAF") score of 58.  AR at 497.

On February 18, 2010, Ms. Perea underwent a mental status examination by Dr.

Warren Steinman, a licensed clinical psychologist.  AR at 571-73.  Dr. Steinman

diagnosed Ms. Perea with "major depressive disorder, single episode, moderate . . .

adjustment disorder with mixed anxiety and depressed mood."  AR at 573.  However,

he found that she functioned intellectually

> within or somewhat below the average range of adult intelligence and is
> capable of understanding most basic instructions. Her ability to
> concentrate and her short-term memory are adequate and she is well
> oriented.  Her ability to carry out instructions she understands is
> moderately limited by her physical limitations. She is reasonably social,
> although shy, and seems able to interact with others effectively. . . She
> seems able to avoid hazards and to adapt to changes.  She also seems able
> to manage her own financial resources.

 AR at 573.

On June 2, 2008, Ms. Perea was examined by Dr. Martin Trujillo as part of the

disability determination process.  AR at 411.  Dr. Trujillo noted Ms. Perea's history of

knee surgeries and back pain, but found no evidence of radiculopathy.  AR at 411.  He

also noted that Ms. Perea had hypertension, hypothyroidism, and bilateral carpal

tunnel syndrome.  AR at 411.  Dr. Trujillo reported that assessing Ms. Perea's functional

capacity was difficult because he believed there was symptom magnification, but that

Ms. Perea "appears to be able to perform light duty."  AR at 411.

4

On July 1, 2008, Dr. Mary Lanette Rees, an agency medical consultant, assessed

Ms. Perea's residual functional capacity.  AR at 414-21.  Dr. Rees found that Ms. Perea

could occasionally lift twenty pounds and frequently lift ten pounds, could sit, stand

and/or walk for about six hours in an eight hour workday, and had no limitations on

her ability to push and/or pull.  AR at 415.  Dr. Rees discussed Ms. Perea's history of

carpal tunnel syndrome, but found that there was no "intrinsic muscle atrophy" and

that Ms. Perea was able to drive.  AR at 417.  Dr. Rees also found that Ms. Perea had no

postural, manipulative, visual, communicative, or environmental limitations.  AR at

416-18.

Another agency medical consultant, Dr. Elizabeth Chiang, completed a

psychiatric review of Ms. Perea on August 12, 2008, finding that her mental

impairment—depression with mild panic or anxiety attacks—was not severe.  AR at

475-88.  She found that Ms. Perea had mild difficulties in maintaining concentration,

persistence, or pace, but no limitations in her activities of daily living or social

functioning, and no episodes of decompensation.  AR at 485.  In making her

determination, Dr. Chiang considered Ms. Perea's function reports and Dr. Elliott's

exam notes.  AR at 487.

On May 11, 2010, Dr. Elliott completed a form outlining Ms. Perea's exertional

limitations.  AR at 574.  This was submitted to the Appeals Council but was not before

the ALJ.  AR at 273.  Dr. Elliott indicated that Ms. Perea could occasionally lift less than

ten pounds, could stand and/or walk for at least two hours in an eight-hour workday,

sit for less than six hours in an eight-hour workday, and her ability to push and pull

was limited in both her upper and lower extremities.  AR at 574.

### B. <u>Hearing Before the ALJ</u>

On January 5, 2010, a hearing was held before ALJ William H. Helsper.  AR at 29-

61.  Ms. Perea and a vocational expert, Judith A. Beard, testified.  AR at 31.  Ms. Perea

testified that she stopped working in 2007, when she fell and injured her knee and back.

AR at 33.   Ms. Perea told the ALJ that she does some household chores, but that her

husband helps with those she cannot do.  AR at 33-34.  She also explained that she does

not sleep very well due to anxiety and depression.  AR at 34-35.  Although she had to

stop seeing her counselor for financial reasons, Ms. Perea stated that she continued to

feel the need to see a counselor.  AR at 41-42.  She explained that she took medication

for the depression, but that approximately twice a week she felt depressed.  AR at 42.

Ms. Perea testified that she did not wear back or knee braces, but that she

occasionally used a cane when her leg hurt.  AR at 38-39.  When asked about her carpal

tunnel syndrome, Ms. Perea explained that she could only use a pen for a brief amount

of time before her fingers went numb.  AR at 43-44.  She also testified that she had

difficulty performing tasks such as picking up paper clips from a table.  AR at 44.  When

asked how long she could stand still, Ms. Perea answered that she could do so for ten to

fifteen minutes.  AR at 47.  She stated that she could sit for the same amount of time,

and that during the day she needs to sit down for about fifteen minutes every two to three hours.  AR at 47-48.  Ms. Perea also testified about her past position as a computer lab monitor, explaining in particular the tasks she performed and their physical requirements.  AR at 52-57.

The vocational expert testified that Ms. Perea's former jobs, as a childcare worker and a computer lab monitor, were semi-skilled, light work jobs.  AR at 58.  She also testified that there would not be jobs available in the national economy for an individual with a semi-skilled work history who had to rest for fifteen minutes at a time at least four times during a workday.  AR at 58-59.

C.  **The ALJ's Decision**

At step one of the disability determination analysis, the ALJ found that Ms. Perea had not been engaged in substantial gainful activity since her alleged disability onset date of November 19, 2007.  AR at 13.  Proceeding to the next step, the ALJ found that Ms. Perea had the following severe combination of impairments: "impairment status-post medial and lateral meniscus tears, chondromalacia, and two arthroscopic surgeries of the right knee;" carpal tunnel syndrome, degenerative disc disease, disc bulges, and facet arthropathy of the lumbar and cervical spine; hypertension; and hypothyroidism. AR at 13.

Also at step two, the ALJ found that Ms. Perea had major depression and an adjustment disorder with anxiety and depressed mood, but that these impairments

were not severe as defined in the regulations.  AR at 14.  He found that Ms. Perea had

mild limitations in her activities of daily living, mild restrictions in maintaining social

functioning, concentration, persistence, and pace, and no episodes of decompensation.

AR at 16.  In making this finding, the ALJ reviewed Ms. Perea's medical records and the

reports from her treating physician, her counselor, the agency consultants, and the

report from the consultative psychological evaluation with Dr. Steinman.  AR at 14-15.

The ALJ gave considerable weight to the agency consultants who found that Ms. Perea

did not have a severe impairment, emphasizing that these opinions were credible and

consistent with the evidence.  AR at 14.  The ALJ recounted all of Dr. Steinman's

findings and noted that Ms. Perea had no problems with concentration, orientation, or

short-term memory.  AR at 16.  He also explained that he did not give significant weight

to Ms. Alaniz's GAF score because it was inconsistent with the examination findings

and Ms. Alaniz appeared to improperly take into account Ms. Perea's physical and

environmental circumstances in determining the score of 58.  AR at 15.

At step three, the ALJ determined that Ms. Perea did not have an impairment or

combination of impairments that meets or equals one of the "Listings" of presumptively

disabling impairments.  AR at 16.  The ALJ found that Ms. Perea had the residual

functional capacity to perform the full range of light work with no significant non-

exertional limitations.  AR at 16.  He also found that Ms. Perea's testimony about the

extent of her pain and limitations was not entirely credible because her reports had

8

been inconsistent and were not "reasonably supported by the objective medical evidence."  AR at 17.

Finally, at step four, the ALJ found that Ms. Perea was capable of performing her past work as a teacher's aide/computer lab monitor, "as she performed it, and as it is generally performed in the national economy."  AR at 22.

Ms. Perea filed applications for disability insurance benefits and supplemental security income on November 19, 2007, alleging disability beginning the same date.  AR at 12.  Her claims were denied and she timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  *Id*.  On March 18, 2010, the ALJ issued a written opinion determining that Ms. Perea was not disabled.  AR at 12-23.  Ms. Perea filed the instant action on October 18, 2011.  *Doc. 1*.

## II.  APPLICABLE LAW

### A.  Standard of review

Pursuant to 42 U.S.C. § 405(g), a court may review a final decision of the Commissioner only to determine whether it (1) is supported by "substantial evidence," and (2) comports with the proper legal standards.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 800-01 (10th Cir. 1991).  "In reviewing the ALJ's decision, 'we neither reweigh the evidence nor substitute our judgment for that of the agency.'"  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Casias*, 933 F.3d at 800. "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). "[I]n addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id*. at 1010. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## B.  Disability determination process

For purposes of Social Security disability insurance benefits, an individual is disabled when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a person satisfies these criteria, the SSA has developed a five step test. *See* 20 C.F.R. § 404.1520. If the Commissioner is able to determine whether an individual is disabled at one step, he does not go on to the next step. *Id*. § 404.1520(a)(4). The steps are as follows:

(1) Claimant must establish that he is not currently engaged in "substantial gainful activity."  If claimant is so engaged, he is not disabled.

(2) Claimant must establish that he has "a severe medically determinable physical or mental impairment . . . or combination of impairments" that have lasted for at least one year.  If claimant is not so impaired, he is not disabled.

(3) Claimant must establish that his impairment(s) are equivalent to a listed impairment that has already been determined to be so severe as to preclude substantial gainful activity.  If listed, the impairment(s) are presumed disabling.

(4) If the claimant's impairment(s) are not listed, claimant must establish that the impairment(s) prevent him from doing his "past relevant work."  If claimant is capable of returning to his past relevant work, he is not disabled.

(5) If claimant establishes that the impairment(s) prevent him from doing his past relevant work, the burden shifts to the Commissioner to show that claimant is able to "make an adjustment to other work."  If the Commissioner is unable to make that showing, claimant is deemed disabled.

*See* 20 C.F.R. § 1520(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).

The primary issue in this case is the fourth step of the five step evaluation process. Step four of the analysis consists of three phases.  *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996).  First, the ALJ determines the claimant's residual functional capacity in light of "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3).  A claimant's RFC is "the most [he] can still do despite [his physical and mental] limitations."  *Id*. § 404.1545(a)(1).  Second, the ALJ determines the physical and mental demands of claimant's past work.  "To make the necessary findings, the ALJ must obtain adequate 'factual information about those work demands which have a bearing on the medically established limitations.'"  *Winfrey*, 92 F.3d at 1024 (quoting Social Security Ruling 82-62 (1982)).  Third, the ALJ determines whether, in light of his RFC, the claimant is capable of meeting those demands.  *Id*. at 1023, 1025.

11

III.   ANALYSIS

Ms. Perea asserts that several legal errors were made in her case.  She argues that (1) the Appeals Council failed to consider her treating physician's medical statement; (2) the Appeals Council failed to consider the Social Security Agency's subsequent decision that Ms. Perea was disabled based on the same evidence; (3) the ALJ erred by finding Ms. Perea's depression was not severe, and by failing to combine the effects of severe and non-severe impairments; (4) the ALJ erred by discounting the evidence of carpal tunnel syndrome after finding it to be severe; (5) the ALJ's credibility assessment is not supported by substantial evidence or a proper legal analysis; and (6) a vocational expert was required to assess Ms. Perea's ability to return to her past work.  *Doc. 19* at 1; *Doc. 20* at 4-14.  The Commissioner argues that the ALJ's determination is supported by substantial evidence and does not contain any legal errors.  *Doc. 24* at 4-19.

A.   **The Appeals Council Properly Considered Dr. Elliot's Opinion**

Ms. Perea argues that the Appeals Council erred by upholding the ALJ's determination that Ms. Perea was not disabled in spite of new evidence, namely the one page May 11, 2010 opinion of Dr. Elliot noting Claimant's exertional limitations (AR at 574).  *Doc. 20* at 4-7.  She asserts that the Appeals Council failed to explain why it did not accord Dr. Elliott's statement controlling weight, as required by the treating physician rule.  *Id.*

Social Security regulations require that, in determining disability, the ALJ give the opinions of treating physicians controlling weight when those opinions are supported by the medical evidence and are consistent with the record; this is known as the "treating physician rule."  20 C.F.R. § 404.1527(d)(2); *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).  To properly reject a treating physician's opinion, an ALJ must follow two steps.  First, the ALJ must find that the opinion is not supported by medical evidence and/or is not consistent with the record.  Second, the ALJ must still give deference to the opinion and weigh it according to factors listed in 20 C.F.R. § 404.1527(c)-(d).  "In applying these factors, the ALJ's findings must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave to the treating source's medical opinion and the reason for that weight."  *Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011) (quotation omitted).

Ms. Perea contends that the Appeals Council must also apply this sequential analysis.  The Tenth Circuit has rejected this argument.  When the Appeals Council, as here, makes new evidence part of the record, it must consider that evidence when reviewing the ALJ's decision.  20 C.F.R. § 404.970(b).  It need not, however, provide any analysis or discussion of the new evidence; it is enough for the Council to state that it considered the evidence and found that it "does not provide a basis for changing the Administrative Law Judge's decision."  *Martinez v. Barnhart*, 444 F.3d 1201, 1207-08 (10th Cir. 2006); AR at 2.

13

Ms. Perea attempts to narrow *Martinez* to its facts.[1]  *Doc. 25* at 1-2.  The Tenth

Circuit, however, has taken the alternative approach and applied *Martinez* broadly.

*Robinson v. Astrue*, 397 F. App'x 430 (10th Cir. 2010), closely resembles this case.  There,

the plaintiff's treating physician submitted a two-page residual functional capacity

questionnaire the day after the ALJ rendered his decision.  397 F. App'x at 432.  The

Appeals Council considered it but determined that it did not provide a basis for

changing the ALJ's decision.  *Id*.  The plaintiff argued that the Council erred in failing to

discuss its consideration of the new evidence.  *Id*.  Relying on *Martinez*, the court found

that the Council's perfunctory reference to the new evidence was sufficient.  *Id*.

Likewise, "[w]hile an express analysis of [Dr. Elliot's opinion] would have been helpful

for purposes of judicial review," the Council is not required to provide such an analysis.

Ms. Perea's argument to the contrary fails.  The Appeals Council did not err in its

consideration of Dr. Elliot's additional evidence.

**B.  The Appeals Council Did Not Err in Failing to Consider Plaintiff's
Subsequent Disability Determination**

Next, Ms. Perea asserts that the case should be remanded for consideration of the

SSA's determination, based on a subsequent application, that Ms. Perea was disabled as

of March 19, 2010, the day after the ALJ issued his decision on her first application.  *Doc.*

---

[1] Ms. Perea argues that this case resembles *Threet v. Barnhart*, 353 F.3d 1185 (10th Cir. 2003), rather than *Martinez*.  In *Threet*, the Appeals Council's decision did not clearly articulate whether the Council had considered properly submitted new evidence.  353 F.3d at 1191-92.  The court found that the Appeals Council erred if it did not consider the entire record, including new evidence, when reviewing the ALJ's decision.  *Id*.  Here, in contrast, the Council explicitly stated that it considered Dr. Elliot's report.  AR at 1-2.

*20* at 7.  She suggests that had the Appeals Council fairly considered Dr. Elliot's opinion, it would have found that she was disabled since that opinion was part of her successful second application.  *Id*.  Ms. Perea has cited no authority to support this contention and it is difficult to believe that the SSA's disability determination in her second application turned entirely on a one page worksheet containing five multiple choice questions and two lines of perfunctory comments that are all limited solely to Claimant's exertional capacity.  *See* AR at 574.  Moreover, in cases where courts have found a subsequent determination relevant, the second application contained new evidence not available in the first.  *See, e.g., Rees v. Colvin*, 2013 WL 1336259, at *2 (E.D. Okla. Mar. 29, 2013); *Chamblin v. Astrue*, 2010 WL 3843031, at *3 (D. Colo. Sept. 24, 2010); *cf. Ruybal v. Astrue*, No. 07-cv-1060 KBM (D.N.M. Mar. 20, 2009) (Doc. 23 at 4-5 & n.2) (finding subsequent award of benefits had no effect on instant application).  Here, the only new evidence Ms. Perea cites to—Dr. Elliot's May 11, 2010 opinion—was properly considered by the Appeals Council in the first application as discussed above.  Thus, Ms. Perea fails to demonstrate how consideration of the second determination would have altered the first.[2]  For these reasons, the Appeals Council did not err in failing to consider the subsequent disability determination.

## C. The ALJ Properly Considered Ms. Perea's GAF scores

---

[2] It is possible that the second application contained other new evidence, in addition to Dr. Elliot's opinion, not presented in Ms. Perea's first application.  This additional new evidence may well have persuaded the SSA to grant her second application.  However, Ms. Perea does not make that argument and the record of the second application is not before this Court.

In her Motion to Remand, Ms. Perea contends that the ALJ improperly determined that her depression was not a severe limitation.  *Doc. 20* at 7-8.  Her argument is focused on the ALJ's decision not to give significant weight to the GAF score of 58 that Ms. Alaniz, a licensed professional clinical counselor, assigned Ms. Perea.  *Doc. 20* at 7-8; *Doc. 25* at 4-5.  A GAF score of 58 is an indication that an individual has "moderate difficulty in social, occupational, or school functioning."[3] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (Text Revision 4th ed. 2000) (*DSM-IV*).  In his decision, the ALJ wrote that a score of 58 is not far from the score that equates with mild symptoms, 61.  AR at 15.  Ms. Perea contends that this statement indicates that the ALJ disregarded evidence in the record in his determination that Ms. Perea did not have a severe mental impairment.  *Doc. 20* at 8.

To determine the degree to which a claimant's medically determinable mental impairment creates a functional limitation, the ALJ looks at four function areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  The degree of limitation is rated on a five-point scale: none, mild, moderate, marked, and extreme.  *Id*. § 404.1520a(c)(4).  If the degree of limitation in the first three functional areas is none or mild, and there are no episodes of decompensation, the ALJ usually concludes that the

---

[3] The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (Text Revision 4th ed. 2000) (*DSM-IV*).

impairments are not severe.  *Id*. § 404.1520a(d)(1).  The ALJ's "decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)."  *Id*. § 404.1520a(e)(4).

"[A] low GAF score does not alone determine disability, but is instead a piece of evidence to be considered with the rest of the record."  *Petree v. Astrue*, 260 F. App'x 33, 42 (10th Cir. 2007).  Here, rather than rely solely on Ms. Alaniz's GAF score, the ALJ properly considered all of the medical evidence in the record in determining the severity of Ms. Perea's mental impairments.  *See id*. § 404.1520a(c)(1) ("Assessment of functional limitations is a complex and highly individualized process that requires [the SSA] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation.").  As a licensed professional clinical counselor, Ms. Alaniz is not an acceptable medical source.  20 C.F.R. §§ 404.1513(a) (disability benefits), 416.913(a) (supplemental security income).  However, the ALJ may still consider her opinion, provided he "explain the weight given to [it,] or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning."  SSR 06-3p (2006).  The ALJ did so here.  In addition to Ms. Alainz's opinion, the ALJ also considered Claimant's mental health history since 2002, as well as the opinions of her treating physician and the SSA physicians.  AR at 14-15.  He noted that Dr. Steinman,

who diagnosed Ms. Perea with moderate major depression and an adjustment disorder in February 2010, also reported that she was able to concentrate and carry out instructions, to interact with others effectively, to avoid hazards, and to adapt to changes.  AR at 15-16.  He also pointed out that Ms. Perea's counselor and the consulting psychologist found that her thought processes were rational and she was capable of understanding most basic instructions.  AR at 15.  Finally, he found that the record did not reflect any episodes of decompensation.  AR at 16.  It was in the context of this broader picture of Ms. Perea's mental health that the ALJ explained that the GAF score "was inconsistent with the examination findings, and it seems Ms. Alaniz took into account Ms. Perea's physical and environmental circumstances in arriving at the score.  I agree with the conclusion of the State agency physicians that Ms. Perea's anxiety and depressed [sic] seemed situational up to that point."  AR at 15.

Based on the above, I find that the ALJ properly considered Ms. Alariz's GAF score and that his severity determination regarding Ms. Perea's depression is supported by substantial evidence.

### D.  The ALJ Erred in Determining Ms. Perea's RFC

Ms. Perea argues that the ALJ failed to consider her mental impairments and carpal tunnel syndrome when determining her RFC.  *Doc. 20* at 8-10.  At step two of the sequential analysis, the ALJ determined that Ms. Perea had a "'severe' combination of [physical] impairments," and listed carpal tunnel syndrome as one of those

impairments.  AR at 13.  As for her mental impairments, he found that although she

suffered from a depressive disorder, major depression, and an adjustment disorder,

these impairments were not severe.  AR at 14.  Rather, he found that Ms. Perea had only

"mild difficulties in maintaining social functioning . . . [and] maintaining concentration,

persistence, or pace."  AR at 16.

If a claimant suffers from multiple impairments, an ALJ must consider all of the

impairments, including those that are not severe, when making an RFC determination.

20 C.F.R. § 404.1545(a)(2), (e).  The ALJ must also consider the claimant's "ability to

meet certain demands of jobs, such as physical demands, mental demands, sensory

requirements, and other functions."  20 C.F.R. § 404.1545(a)(4); *see also Farrill v. Astrue*,

No. 12-3039, 486 F. App'x 711, 713 (10th Cir. 2012).  The mental RFC assessment at step

four of the SEP requires a more detailed assessment than that at step two.  SSR 96-8P.

In this case, the ALJ did not discuss Ms. Perea's mental impairments after he

determined that they were not severe.  AR at 16-23.  There is no evidence that he

considered how her mental impairments, even though they were non-severe, would

affect her ability to work.  Although he recounted Ms. Perea's testimony regarding her

depression, he did not explain how her depression affected his RFC determination.  *See*

AR at 17.

The ALJ also erred in failing to consider the mental requirements of Ms. Perea's

past work.  When a claimant has a mental impairment, the ALJ must "obtain a precise

description of the particular job duties which are likely to produce tension and anxiety . . . in order to determine if the claimant's mental impairment is compatible with the performance of such work." *Winfrey*, 92 F.3d at 1024.  At the hearing, the ALJ asked Ms. Perea about her past work, but his inquiry focused on the physical requirements of the position.  AR at 49-52.  In his written opinion, he discussed only the physical demands of Ms. Perea's past relevant work.  AR at 22-23.  The ALJ's failure to discuss the effect of Ms. Perea's mental limitations on her RFC and the mental requirements of her past work constitutes legal error

## IV.   CONCLUSION

For the reasons discussed above, I find that the ALJ erred when he determined Ms. Perea's RFC and that she was capable of performing her past relevant work.  I do not address Ms. Perea's arguments that the ALJ erred in his treatment of Ms. Perea's carpal tunnel syndrome and in his credibility assessment, or that a vocational expert was required to assess Ms. Perea's ability to perform her past work, because I found other errors in the RFC determination and at step four of the disability determination analysis.  I recommend that Ms. Perea's Motion to Remand or Reverse be GRANTED and that this case be REMANDED to the Commissioner.

GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**